UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

VERNANDO ROSS,

Petitioner,

v.                                           CAUSE NO. 3:17-CV-47-JD-MGG

SUPERINTENDENT,

Respondent.

OPINION AND ORDER

Vernando Ross,[1] a prisoner without a lawyer, filed a habeas corpus petition to challenge his convictions and sentences for murder and attempted murder under Case No. 49A05-611-MR-219268. Following a jury trial, on February 7, 2008, the Marion Superior Court sentenced Ross to eighty-six years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> On the night of November 2, 2006, Lue Moffett was visiting his uncle, Willie Johnson, at Johnson's home on West 28th Street in Indianapolis. Moffett, Johnson, and one of Johnson's female friends (known as "Blondie") were drinking beer and listening to music. Earlier that evening, they had also smoked crack cocaine. Paul Baker, who had been living with

---

[1] The petitioner is also known by "Randle Jackson" and is registered under that name with the Indiana Department of Correction. While the parties do not explain this discrepancy, they each refer to the petitioner as "Ross" in their filings in this case, so the court will follow suit.

Johnson for a few months, became a topic of conversation. Baker and Johnson had apparently not been getting along and Johnson's landlord and friend wanted Baker out of the residence.

While Moffett was at the back of the house using the restroom, Baker and Ross entered the residence. An argument quickly broke out, and Blondie went to alert Moffett. Moffett returned to find Ross waiving a handgun and shouting, "You mother fuckers are going to respect Baker, do you hear what the fuck I'm saying, I'll shoot you in your goddamn face, you hear what I'm saying?" As Moffett stepped into the room, Ross turned and said, "Who the fuck is this, get your ass over here, you want some of this shit too?" Moffett put his hands in the air and asked what was going on. Ross responded, "Shut your mother fucking ass up, you want me to kill your ass too, get your ass over in that corner with Johnson." Moffett did not do as requested, so Ross fired a shot toward Moffett's feet.

Moffett then immediately "rushed Ross to the couch" and tried to get the gun from him. When the struggle proved unsuccessful, Moffett pushed off of Ross in order to "make for the door". As Moffett pushed off, Ross shot him in the groin. Moffett then stood up, and Ross shot him again, striking him in the right thigh. The shot knocked Moffett to the ground.

As Moffett fell, Johnson tackled Ross. Ross shot his gun two or three more times as he and Johnson struggled. Moffett then ran from the house to call 911, hearing more gunshots as he fled. Johnson ultimately suffered five gunshot wounds. Two of the wounds were fatal, particularly the one that entered his neck and fractured a vertebra. Johnson likely died within five minutes of this shot. Johnson was also shot in the chest, right flank, right hip, and left thigh. Further, there was evidence that he had been kicked in the forehead.

Due to confusion regarding Moffett's description of the location of the shooting, Johnson's body was not discovered until the following morning. His body was found on the floor in the area he and Ross had been struggling when Moffett fled. Police recovered Ross's cell phone and a necklace, like one commonly worn by Ross, at the scene. Eight .40 caliber shell casings, all fired from the same handgun, and five bullets were also found. Ross was not identified until several days after the shooting.

On the night of the shooting or early the next morning, Ross spoke with his friend, Julian Marshall. Ross had been drinking and was "hyped up". Ross was rambling and repeatedly saying, "m-one, you hear me, I killed and my 40 was spitting." Marshall explained that in street terminology

2

"m-one" means murder and "40" refers to a .40 caliber handgun. Marshall further opined that "spitting" meant the gun was "shooting good." Ross indicated that he went there to tell them to stop disrespecting Baker and things got "hectic" when another individual came out from the back. Ross told Marshall that he shot two men, one in the leg and one in the head or face. Ross explained that after the struggle he was getting ready to leave but then the man (Johnson) tried to get up and Ross shot him in the head or face. Ross said he threw the gun in Eagle Creek Reservoir.

Later that morning, Ross contacted Marshall again. He was "paranoid" and needed to get out of the house. Marshall picked up Ross and drove him around town. One of the stops was Eagle Creek, where Ross wanted to make sure the gun had made it into the water. After another day or two, Ross came to Marshall's house and indicated that he thought the police were on to him. He asked Marshall and Marshall's girlfriend to provide him with a false alibi. Ross was arrested on November 15. Ross called Marshall from jail twenty to thirty times over the next two weeks seeking his help with respect to an alibi and passing a message onto Baker.

Ross was charged with murder, attempted murder, and carrying a handgun without a license. The State also filed a notice of probation violation stemming from a previous conviction for which he was on home detention and probation at the time of the instant offense. Before the jury trial, the trial court granted a motion in limine prohibiting the State from presenting any evidence referring to Ross as "Ghetto Godfather", a term that had appeared on his cell phone records. In compliance with that ruling, the State introduced redacted copies of Ross's cell phone records into evidence.

During closing argument, the State utilized a computer-generated slide show. Two slides in the presentation inadvertently contained unredacted copies of exhibits, both referring once to "Ghetto Godfather." Each slide was displayed for about three to five seconds. Ross objected during the second slide and sought a mistrial. The trial court denied the motion for mistrial and admonished the jury as follows:

Ladies and gentlemen, sometimes when you're dealing with the newest generations of technology you need to have a good reliable fifth grader around to help you out. That didn't happen here and the last two screens that were on the TV were not copies of the exhibits that were introduced in the trial. I have no idea if you noticed a distinction or not. If you did, don't consider the screens at all. They are of no force and affect. If you

3

hear somebody talking about something that's a distinction, stop them. It's not a subject for deliberation and I don't, in my heart, think that anybody did anything on purpose, but there, it's beyond doubt a mistake was made.

On January 16, 2008, the jury found Ross guilty as set forth above.

ECF 14-4 at 2-6. *Ross v. State*, 2008 WL 4603445, at *1–3 (Ind. App. 2008).

Ross argues that he is entitled to habeas relief due to insufficiency of the evidence and due to prosecutorial misconduct during closing arguments. He also argues that trial counsel provided him with ineffective assistance by failing to properly impeach Lue Moffett and Julian Marshall, by failing to call alibi witnesses, by failing to object to recorded calls, by failing to advise the trial court of a conflict of interest, and due to cumulative error.

Ross also argues that he did not receive adequate due process during State post-conviction proceedings because the State court did not subpoena a witness or consider her affidavit. Procedural errors during State post-conviction proceedings are not a cognizable basis for habeas relief because there is no constitutional right to such proceedings, *see Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Tabb v. Christianson*, 855 F.3d 757, 767 (7th Cir. 2017). Therefore, this claim is not a basis for habeas relief.

<u>PROCEDURAL DEFAULT</u>

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). For a federal court to hear his or her claims, a habeas petitioner must have fully and fairly presented his or her federal claims

to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceeding." *Lewis*, 390 F.3d at 1025. "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory. *Id.*

In his petition to transfer to the Indiana Supreme Court, Ross did not present the claim that trial counsel should have informed the trial court of a conflict of interest or the claim of prosecutorial misconduct during closing arguments. ECF 14-11. Therefore, these claims are procedurally defaulted, and Ross offers no basis to excuse default. Ross presented the remaining claims at each level of the State courts.

<u>STANDARD OF REVIEW</u>

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376. Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

## ANALYSIS

### Sufficiency of the Evidence

Ross argues that he is entitled to habeas relief because the evidence was insufficient to support the requisite mental culpability for his convictions for murder and attempted murder. For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

At trial, the prosecution presented Lue Moffett, who testified that Ross entered Willie Johnson's residence, waved a handgun, and demanded that those present treat Paul Baker with more respect. Trial Tr. 105-08. He told Moffett, "[S]hut your mother fucking ass up, you want me to kill your ass too, get your ass over in that corner." *Id.* When Moffett did not immediately respond to Ross's commands, Ross fired the handgun at Moffett's feet. *Id.* Moffett rushed toward Ross in an effort to disarm Ross. *Id.* Moffett realized that this effort was futile, and, when he attempted to disengage Ross, Ross shot him in the groin area twice. *Id.* at 110-11. As Moffett left the house, Johnson tackled Ross, and Moffett heard additional gunshots. *Id.* at 112, 122-23. According to Dr. Radentz, who performed the autopsy, Johnson suffered five gunshot wounds, including a neck wound and a chest wound. *Id.* at 369-70. According to Julian Marshall, Ross told Marshall that he had committed "m-one," and that he shot Williams in the head as he attempted to get up. *Id.* at 621-24.

The jury instructions defined the offenses of murder and attempted murder, reading, "A person who knowingly or intentionally kills another human being commits murder," and "A person attempts to commit murder when, acting with the specific intent to kill another person, he engages in conduct that constitutes a substantial step

toward killing that person." Direct Appeal App. 121-42. They defined the term "knowingly" by stating, "A person engages in conduct knowingly if, when he/she engaged in conduct, he/she is aware of a high probability that he/she is doing so, and "intentionally" as "A person engages in conduct intentionally if, when he/she engages in the conduct, it is his/her conscious objective to do so." *Id.*

On direct appeal, the Court of Appeals of Indiana rejected the claim with respect to the attempted murder conviction, noting Moffett's testimony that Ross threatened to kill Moffett, fired at his feet, and shot Moffett twice as Moffett tried to get away from him. ECF 14-4 at 6-8. The appellate court also rejected the claim with respect to the murder conviction, observing the number of Williams' gunshot wounds and relying on Marshall's testimony that Ross had confessed that he had murdered Williams by shooting him in the head as Williams tried to get up. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on the sufficiency of the evidence claims. With respect to the attempted murder conviction, the record contains evidence to suggest that Ross entered the Williams' residence, waved a handgun around, threatened to kill Moffett if he did not comply with his commands, and intentionally shot near Moffett's feet to emphasize the sincerity of the threat. After this show of force, Ross shot Moffett twice as Moffett attempted to flee from a physical struggle that provided Ross with an even greater incentive for Ross to kill Moffett. Based on the evidence, a jury could reasonably conclude that Ross shot Moffett with the specific intent of killing him.

The record contains even more evidentiary support that Ross intentionally or knowingly killed Williams. In addition to the events described by Moffett, the record indicates that Ross shot Williams five times, including once in the neck when Williams tried to get up as Ross fled the residence, and that he described his interaction with Williams as "m-one," a shorthand term for first degree murder, which implies an intentional killing. *See e.g.,* 28 U.S.C. § 1111 (federal murder statute); 720 Ill. Comp. Stat. 5/9-1(a) (Illinois); N.Y. Penal Law § 125.27 (New York). Therefore, the claim that the record lacked sufficient evidence to support the convictions for murder and attempted murder is not a basis for habeas relief.

<u>Ineffective Assistance - Witness Moffett</u>

Ross argues that he is entitled to habeas relief because trial counsel failed to properly impeach Lue Moffett. He contends that trial counsel did not keep his promise during opening statements that a police officer would tell the jury that Moffett told him that "he was shot at the corner by somebody he didn't know." Trial Tr. 87. He further contends that trial counsel should have impeached Moffett with his use of cocaine and alcohol and his failure to report material facts at the outset of the police investigation, including the shooting of Willie Johnson, Johnson's legal name, and his involvement in the events preceding the shootings.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable

9

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland.*" *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

Officer Burton prepared a report on his efforts as a first responder after Moffett contacted the police immediately after the shooting, which included the following statements.

> Mr. Moffett told me that the shooting happened on the corner of 28th and Highland. Mr. Moffett then told me that the he had been shot in the groin by a 9mm handgun. Mr. Moffett then stated that the suspect was a short black male with braids in his hair.

> * * *

> Upon speaking with the two detectives at Methodist Hospital, I found that Mr. Moffett was at his uncle Sonny Moffett's house when Paul Baker and an unknown suspect to me at this time showed up at the residence. Mr. Lue Moffett stated that he and the unknown suspect had got into a altercation and that Paul Baker tried to break up the fight. Mr. Moffett then stated that the unknown suspect then pulled a 9mm and started to shoot at him.

PCR App. 80-81. Detective Lappin prepared a report on his interview with Moffett at the hospital after the shooting, stating, " Stated his uncle's name was Sonny Moffett. He could not tell me where his uncle lived or a street name. He knew it was two houses from the corner. . . . I asked Lou Moffett if anyone else had gotten shot and he replied 'no.'" *Id.* at 180-81.

The notes from Detective Prater, who investigated the shootings, attribute the following to Moffett:

> Me, Blondie, and Willie
> Smoking
> Knock at the door, loud knock
> Willie goes to the door
> Heard Willie open front door
> I went to kitchen to get a beer when I heard Willie open the front door.
> Blondie came out and went to front room.
> She came back to kitchen and said they're in there arguing

*Id.* at 189.

At trial, Moffett testified that he had encountered Ross at the Johnson residence eight to ten times but that he could not recall Ross' name until he spoke with Johnson's friend and landlord the morning after the shootings. Trial Tr. 102-03. He testified that he did not know that Johnson had been shot when he spoke to Detective Lappin at the hospital. *Id.* at 148-52. He testified that he drank alcohol and smoked cocaine that day before Ross' arrival but specified that he did not smoke cocaine after his trip to the liquor store. *Id.* at 94-99. He testified that cocaine had a relaxing effect on him but did not impede his ability to see people or cause him to hallucinate. *Id.* The prosecution introduced Moffett's call for emergency services after he was shot and played it for the

11

jury. *Id.* at 131-32. Officer Brown, the first police officer to respond to Moffett after the shooting, testified that Moffett told him that he was shot at the corner of 28th and Highland. *Id.* at 226, 231. Detective Lappin testified that, at the hospital, Moffett described the shooter as Baker's relative and as a short black male with braids but that Moffett did not know his name. *Id.* at 408-09. He also testified that Moffett identified his uncle as "Sonny Moffett," that Moffett did not know his uncle's address, and that Moffett represented that no one else had been shot. *Id.* at 403. 408.

At the post-conviction stage, trial counsel testified as follows:

**Q:** During the same 911 call, he was questioned by the 911 operator several times as to what's going on and he failed to answer and at the end he stated I don't know, I got shot, I'm bleeding when questioned several times as to what happened. You didn't find this important to ask him why he didn't tell the police the truth about what was going on at that time?

**A:** I didn't want to emphasize the fact that he was in shock after being shot, no.

**Q:** But at the same time shouldn't they know, should you have brought out the fact that he's evading, telling the police or the 911 operator what was actually going on?

**A:** I don't believe that he would have testified he was evading. I think he would have testified he was going into shock after being shot.

**Q:** But he was, as you questioned him, he would still have to explain why he told them he didn't know what was going on when asked numerous times what's going on over there.

**A:** I understand that, and I did not want to emphasize that was going -- how he was going to explain that.

\* \* \*

12

**Q:** Regarding his questions today regarding your cross-examination at trial, is there a general strategic reason or just a reason at trial why you might not ask a witness about every single minor inconsistency?

**A:** Yes.

**Q:** And why would that be?

**A:** Simply knowing what the explanation would be an inconsistency that I wouldn't want brought out.

**Q:** Okay, so sometimes the explanation can be damaging to the client?

**A:** Yes.

**Q:** Okay. Is it also fair to say that if, you know, the witness says something happened at 1:00 one time and then 1:01 at another time and it doesn't matter, is that effective to the jury to just point out those insignificant inconsistencies?

**A:** In my experience, the minute details are not the inconsistences that are going to be persuasive to a jury.

PCR Tr. 19-20, 96-97.

The Court of Appeals of Indiana rejected the claim that trial counsel failed to impeach Moffett, observing that trial counsel cross-examined Moffett at length, attacked his recollection of material facts, and questioned him about his use of cocaine and alcohol on the night of the shootings. ECF 14-10 at 7. The appellate court further observed that trial counsel declined to cross-examine Moffett on other inconsistencies due to concerns that it would prejudice Ross, evoke sympathy for Moffett as a victim, or involve minute details. *Id.* The appellate court concluded that trial counsel's method of impeaching Moffett was a reasonable strategic decision. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on the claim regarding the impeachment of Moffett. To start, trial witnesses testified on many of the allegedly omitted topics, including testimony from law enforcement that Moffett told them that he was shot at the corner of 28th and Highland by an individual who he could not identify by name and that Moffett misidentified Johnson and reported that no one else had been shot. The jury also heard Moffett's call to emergency services and could thus deduce the material information he had omitted during that call. Moffett conceded that he had consumed alcohol and cocaine before Ross's arrival at the residence.

Ross asserts that trial counsel should have impeached Moffett's testimony on the timing of the cocaine use with Detective Prater's notes, but these notes are too imprecise to contradict Moffett's statement that he did not consume cocaine after he returned to the liquor store. It is also unclear that such a contradiction would have had affected the jury's assessment of Moffett's credibility given Moffett's testimony that his cocaine use would not have impeded his ability to identify the shooter that night. Further, trial counsel adequately explained why he did not pursue these topics further, noting that he did not want to emphasize that Moffett was in a state of shock after incurring gunshot wounds and that the discrepancies were too inconsequential to persuade the jury that the material aspects of Moffett's testimony were not credible. Therefore, the claim that trial counsel failed to impeach Moffett is not a basis for habeas relief.

Ineffective Assistance - Witness Marshall

Ross argues that he is entitled to habeas relief because trial counsel failed to

impeach Julian Marshall. He contends that trial counsel should have impeached Marshall's testimony that he had told the truth about what he had heard from Ross about the shootings. He further contends that his trial counsel should have impeached Marshall's testimony that he knew only what Ross' girlfriend told him about the case. He argues that these statements should have been impeached with evidence that Marshall had reviewed the probable cause affidavit with Ross' girlfriend and that he spoke to Baker at the hospital.

At trial, Marshall testified that he cooperated with the investigation and the prosecution of Ross in effort to obtain favorable sentencing on his cocaine-related criminal charges. Trial Tr. 601-11. He saw Ross at Ross' house in the early morning after the shootings, and Ross told him he had shot one person and killed another person with his handgun at the Johnson residence. *Id.* at 617-26. Later that morning, Ross asked Marshall to drive him to a lake. *Id.* at 627-34. Ross explained that he had thrown his handgun from his car window and wanted to make sure that the lake water had concealed it. *Id.* Ross also told him that he believed that he had left his cellphone and necklace at the Johnson residence. *Id.* at 685. Ross asked Marshall and his fiancée to provide him with an alibi, and these conversations continued by telephone even after Ross' arrest and detainment at the Marion County Jail. *Id.* at 640-44. These calls were recorded, and portions were played for the jury, including a portion in which Ross asked Marshall to tell Baker to lie about his presence at the Johnson residence and a portion in which Ross asked Marshall to meet with Ross' counsel. *Id.* at 662-68. After consulting with his own counsel, Marshall spoke with Detective Prater and the

prosecuting attorney about Ross. *Id.* at 672-84. At the end of his direct examination, the

prosecution asked. "Mr. Marshall, did the defendant, Vernando Ross, Randy, tell you,

in fact, tell you everything that you've told this jury today that he told you about the

murder that he committed?" Marshall responded, "Yes, sir." *Id.* at 691-92.

On cross-examination, Marshall testified that he continued to have contact with

Ross and his girlfriend after Ross' arrest and had attended Ross' pretrial hearings. *Id.* at

697. Trial counsel questioned Ross at length about his cooperation with the prosecution.

692-729, 742-47, 751. Trial counsel also pursued the following line of questioning:

> **Q:** Now, you said that throughout this time period when Vernando was
> arrested November 15 until middle of January when you got arrested, you
> maintained contact with him and with his girlfriend.
>
> **A:** Only until about the middle of December.
>
> **Q:** Okay, I'm sorry, you're right. You said until the middle of December.
> In the middle of December, up until that point you had access, you came
> to court with him, you had access to talk to her, you know about the case
> and what was going on with it, right?
>
> **A:** What she told me.
>
> **Q:** Okay. She told you what he was accused of, what they're saying
> happened, and all that right?
>
> **A:** Right.

*Id.* at 714-15.

At the post-conviction stage, trial counsel testified about the cross-examination of

Marshall as follows:

> **A:** Let me -- I don't know where you're going with this but I can cut you
> off real short and explain why I didn't do certain things, okay?

**Q:** Okay.

**A:** It became clear early on in this case, like within maybe the first month that Julian Marshall was not credible, no matter who he was talking to or what he was saying.

**Q:** Okay.

**A:** Okay? And the fact that he was willing to fabricate an alibi, I wasn't going to put him on to testify about that, no. That would have been really bad trial strategy.

**Q:** Okay. Being that he's testifying for the State, wouldn't it have been advantageous to show that he's still a liar?

**A:** I think it was more advantageous to prove that he was getting a deal from the State on his own charges as to a motive for lying versus going into each individual lie that I found would be harmful to you.

\* \* \*

**Q:** Do you recall listening to those same record calls, phone calls introduced by the State and me and him conversing about he had read the probable cause affidavit with my girlfriend?

**A:** If it's in the phone call that were, were introduced then yes, it would have been in, it's in the record.

**Q:** So that wouldn't have been relevant to introduce to him and ask him why he lied about reading the probable cause affidavit?

**A:** Um, I guess it could have shown that he lied, I guess it was more likely that he was going to say he read it to help you construct your alibi so I wouldn't have asked him about it.

**Q:** But he had already testified that he did read it so to turn around and say that would be another story, wouldn't it?

**A:** I guess I could have crossed him on whether he lied about not reading it.

**Q:** Yes.

**A:** But I didn't want his explanation as to why he lied about it.

\* \* \*

**Q:** Okay. At the point that they were introducing phone, recorded phone calls, do you recall me informing you that the code, the code that we was speaking on the phone was related to drug deals?

**A:** I believe I was already aware of that before they introduced them.

**Q:** Okay, at the point that the State is introducing brief segments and those interpretations could be taken out of context by the jury, you didn't feel that Mr. Marshall needed to be questioned as to, you know what I'm saying, that these phone calls pertained to drug deals and not me asking for a false alibi?

**A:** Um, I don't think there was any way to explain all the phone calls as drug deals versus fabricating an alibi and I wasn't going to introduce the fact that you and Mr. Marshall were involved in drug dealing, no.

PCR Tr. 78-89.

The Court of Appeals of Indiana rejected the claim that trial counsel failed to impeach Marshall, finding that trial counsel's strategy of focusing on Marshall's strong incentives for cooperating with the prosecution was reasonable. ECF 14-10 at 8. The appellate court also found that it was reasonable for trial counsel to avoid questions that would have emphasized Ross' efforts to fabricate an alibi or his efforts to conduct illegal transactions with Marshall. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination with respect to the claim regarding the impeachment of Marshall. Marshall's access to other sources of information regarding Ross's criminal case did not undermine his testimony that he had accurately conveyed what Ross had told him about the shootings. Marshall's vague answer to a compound question on

cross-examination may have implied that he knew only what Ross' girlfriend told him about the case until the middle of December 2006, but he had already acknowledged that he had learned details of the case from Ross, had attended Ross' pretrial hearings, and had received instructions from Ross to meet with Baker and Ross' counsel. Further, questions about Marshall's review of the probable cause affidavit and his communications with Baker at Ross's request would have emphasized Ross's efforts to fabricate evidence, which would have likely prejudiced Ross' defense. Therefore, the claim that trial counsel failed to impeach Marshall is not a basis for habeas relief.

Ineffective Assistance - Recorded Calls

Ross argues that he is entitled to habeas relief because trial counsel did not properly object to the recorded calls between Ross and Marshall. He contends that trial counsel should not have permitted the prosecution to play Ross' identification of himself as "diabolical" and should not have allowed the prosecution to play recorded calls without context or to misquote one of Ross's statements in the recorded calls.

During the direct examination of Marshall, the prosecution played six portions of recorded calls between Ross and Marshall during his time at the Marion County Jail. Trial Tr. 662-69. At closing, the prosecution argued:

> And of course the defendant's own words on the call. Next, please. What's the matter, man? Nothing. Why you sound all? Sounding what? Sounding like a mother fucker, like I committed another murder when I was locked up.[2] I saw you taking notes, I'm going to give you one more chance to hear it.

---

[2] Ross maintains that the prosecution omitted two words and that his statement on the recorded call was: You were sounding like a mother fucker *told you* I committed another murder while I was locked up.

PORTION OF EXHIBIT PLAYED FOR JURY

> All right. Sounding like I committed another murder. This may be obvious but to commit another murder you have to have committed a first murder. His own words, he admitted it, committed another murder. It also shows you the confidence he would, in fact, have had in Julian Marshall.

*Id.* at 1012-13. This portion of the recorded calls was played during Marshall's testimony and was played again immediately after Marshall's testimony at the jury's request. *Id.* at 752-56.

At the post-conviction stage, trial counsel testified about the recorded calls as follows:

> **Q:** Was it true that they only played excerpts of tapes and not played them fully?
>
> **A:** They did not play every one of your jail calls, no.
>
> **Q:** I'm saying the ones they introduced, they were segmented.
>
> **A:** There were portions that were redacted, yes.
>
> **Q:** Yes. Did you listen to them before they played them for the jury?
>
> **A:** I listened to the entire calls. I'm the one who asked that they be redacted or agreed that certain portions were not admissible because they discussed certain other criminal acts that you weren't on trial for.
>
> **Q:** Okay, so diabolical, when they played that, that was okay to be played you felt when you was having them redacted?
>
> **A:** What do you mean diabolical?
>
> **Q:** When you first get on the phone and they ask you who's speaking, I saw diabolical. You didn't feel that was prejudicial and needed to be redacted?

20

**A:** That was not subject to legal redaction. That was your own statement.

**Q:** Okay, but it wasn't the substance of what the tapes were introduced for, correct?

**A:** It established who was on the phone.

PCR Tr. 71-72.

The Court of Appeals of Indiana rejected this claim, noting that Ross had not identified a valid basis for objecting to the "diabolical" reference and that Ross had used that term to identify himself on the recorded call. ECF 14-10 at 11-12. The appellate court further noted trial counsel's reluctance to insist on additional context for the portions of the recorded calls played to the jury because it would have resulted in the introduction of Ross's involvement with illegal drug transactions. *Id.* The appellate court concluded that Ross had failed to establish that any objections to the recorded calls played to the jury would have been sustained. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination with respect to the recorded calls between Ross and Marshall. Though Ross argues that the "diabolical" reference should have been excluded because its risk of unfair prejudice substantially outweighed its probative value, the Court of Appeals of Indiana was not persuaded that trial counsel's decision to not object on this basis constituted deficient performance. This term had probative value due to its role in identifying Ross as a speaker on the recorded calls, and the risk of unfair prejudice posed by the term is not so extreme as to render the appellate court's decision unreasonable. Further, while the prosecution may have misquoted Ross's

statement during one of the recorded calls, it is unclear how this misquote was material given that Ross concedes that he used language that implied that he had previously committed murder and given that the jury heard this particular recorded call on three occasions and would have been able to determine what Ross had said on their own. Additionally, the court agrees that trial counsel's decision to avoid introducing evidence that Ross conducted illegal drug transactions from jail was a reasonable strategy. Therefore, the claim that trial counsel did not properly object to the recorded calls is not a basis for habeas relief.

<u>Ineffective Assistance - Alibi Witnesses</u>

Ross argues that he is entitled to habeas relief because trial counsel failed to call alibi witnesses at trial. He contends that Leah Lewis, Andrea Thompson, and Andrea Davis would have testified that Ross was at a strip club at the time of the shooting.

At trial, the parties did not establish the precise time of the shooting but did establish that Moffett called emergency services at 10:07 p.m. and that this was shortly after he was shot at the Johnson residence. Trial Tr. 130-33, 176-77. At the post-conviction stage, trial counsel testified as follows:

**Q:** You had an investigator on my case, his name was Larry Atwell.

**A:** I did employ Mr. Atwell in investigating certain aspects of your case, yes.

**Q:** You sent him to talk to two alibi witnesses?

**A:** Yes.

**Q:** Leah Lewis and Andrea Thompson.

22

**A:** I don't recall exact names but if you're talking about the club on 16th Street, whatever the name of it, I don't remember the name of it, but yes.

**Q:** So you don't recall the substance of the information he gave you concerning them?

**A:** I do. Well, not the exact but I do recall.

* * *

**A:** Mr. Atwell investigated your alibi that you were at the Sunset Strip and the two witnesses he interviewed that you gave me names of did not put you there at the time of the shooting. They put you there that night but not at the time of the shooting.

**Q:** Okay. Do you recall what time Leah Lewis came to work that night?

**A:** I do not recall specifics, no sir, I'm sorry. You can call Mr. Atwell. I think he took notes of his meetings with them.

**Q:** Okay. Do you recall talking to Andrea Davis?

**A:** I do, on multiple occasions.

**Q:** Okay, do you recall what she said as far as coming to Sunset Strip that night?

**A:** I don't recall exactly what she testified or what she told me about coming to. I do recall she said something about you being there, yes.

**Q:** Did she tell you that she picked me up?

**A:** I believe that she did.

* * *

**Q:** Do you believe that you looked into all the potential witnesses that Mr. Ross suggested?

**A:** Yes.

**Q:** And I know that you touched on this earlier but can you explain why you did not call -- I think your testimony earlier was that the people who

were supposed to be alibi witnesses would not have, in fact, provided an alibi. Is that correct?

**A:** The investigation we conducted indicated that though they could place him at a location other than the scene of the shooting at a time, it was not a time that would have been an alibi, it simply would have had him at a difference place earlier.

PCR Tr. 65-69, 97.

Leah Lewis also testified, stating that she arrived at the strip club between 9:30 p.m. and 10:00 p.m. and that she saw Ross there. *Id.* at 108-24. According to Lewis, he left sometime after 10:00 p.m., though she was unable to recall the exact time. *Id.* Her recollection would have been better in 2006 when the shootings occurred than during the post-conviction hearing in 2013, and she testified that she would have told the truth to the investigator hired by trial counsel. *Id.* Her testimony at the evidentiary hearing was based on her usual routine at her job at the strip club, which she continued to hold as of the date of the post-conviction hearing. *Id.* The post-conviction record included a map demonstrating that the driving time from the strip club to the Johnson residence was about ten minutes but no evidence to show how Thompson or Davis would have testified as witnesses.  PCR App. 76-77.

The Court of Appeals of Indiana rejected the claim that trial counsel failed to present alibi witnesses, crediting trial counsel's testimony that he had investigated each of the suggested alibi witnesses but found that their testimony would not have provided an alibi for Ross. ECF 14-10 at 8-10. The appellate court noted that Lewis testified that she did not recall the exact time Ross left the strip club and that her statements in 2006 would have been more accurate. *Id.* The appellate court further

noted that the record contained no evidence to suggest that the alibi witnesses provided a definite, exculpatory timeline during their communications with trial counsel or his investigator. *Id.* The appellate court concluded that the decision to not call these witnesses was a reasonable strategic decision. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination with respect to the alibi witnesses. Trial counsel testified that he declined to present the alibi witnesses because his investigation revealed that their testimony would have been insufficient to establish an alibi, and the State court credited that testimony. This court must accept this factual finding as true unless rebutted with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Lewis' testimony in which she acknowledged an inexact recollection due to the substantial passage of time and that she would have been more accurate during trial counsel's investigation in 2006 does not amount to clear and convincing evidence. Therefore, the claim that trial counsel should have presented alibi witnesses is not a basis for habeas relief.

<u>Trial Counsel - Cumulative Error</u>

Ross argues that he is entitled to habeas relief because the Court of Appeals of Indiana did not consider whether the cumulative errors of trial counsel amounted to ineffective assistance. "[P]rejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008). The appellate court found that each of the errors

25

alleged by Ross were reasonable strategic decisions rather than errors. ECF 14-10. As discussed above, these findings were not unreasonable, so it follows that the decision to omit any discussion of cumulative error and to not find prejudice based on cumulative error was also not unreasonable. Therefore, the claim of cumulative error is not a basis for habeas relief.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Ross to proceed further.

For these reasons, the court DENIES the habeas corpus petition; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on February 4, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT